UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARINA KALJAJ, | ECF CASE |
| Plaintiff, | |
| | No.:_____ |
| v. | |
| | COMPLAINT |
| SOUTHERN GRAPHIC SYSTEMS, LLC d/b/a SGS & Co and COLGATE-PALMOLIVE COMPANY, Jointly and Severally, | |
| Defendants. | |

1.      Plaintiff Marina Kaljaj ("Plaintiff") worked as a Design Execution Manager for Defendants Southern Graphic Systems, LLC d/b/a SGS & Co ("SGS") and Colgate-Palmolive Company ("Colgate-Palmolive") (collectively, "Defendants"), from February 22, 2023, until July 16, 2024, when they abruptly terminated her employment one week before she was scheduled to give birth. Despite Plaintiff's exemplary performance, documented through multiple excellent performance reviews and reference letters, Defendants waited until she was one week before giving birth to terminate her and prevent her from taking maternity leave, instead sending Plaintiff into a series of panic attacks and condemning her to have to seek food stamps assistance and face potential homelessness immediately after giving birth due to loss of income due to Defendants' pregnancy discrimination.

2.      Plaintiff alleges that Colgate-Palmolive knowingly and unlawfully engages in unlawful hiring practices by misclassifying full-time employees as contractors and keeping them on the books of other vendors, such as SGS, in a futile effort to avoid being bound by New York State and federal laws protecting employees, including in order to avoid paying maternity leave and other benefits to its employees. Despite Plaintiff being Colgate-Palmolive's full-time

employee, because of the unlawful arrangement with SGS, Colgate-Palmolive fired Plaintiff a week before her delivery date of her first child in order to avoid paying her full maternity benefits, avoid having to keep her job protected and avoid having to deal with childrearing accommodations with Plaintiff post-delivery; Instead, with the shield of SGS, Colgate-Palmolive could get rid of Plaintiff and had the benefit of immediately replacing her with a non-pregnant worker, who did not need to take time off for child delivery or infant rearing afterwards. SGS aided and abetted this unlawful arrangement for its financial benefits and to retain a cut of Plaintiff's salary for themselves at her cost.

3.      Defendants' unlawful practices, including the discriminatory termination, caused Plaintiff severe emotional distress and financial hardship, leading to postpartum depression and several other psychological damaging conditions, for which she has been prescribed several different medications, inability to breastfeed due to stress, and the need to rely on public assistance programs including food stamps and cash assistance to support herself and her newborn child. Following her termination, Plaintiff was left without health insurance coverage during the critical final weeks of her pregnancy and is facing eviction proceedings because of the sudden loss of her income due to Defendants' pregnancy discrimination, leading her into further emotional distress, including suicidal ideations.

4.      Plaintiff asserts claims of pregnancy discrimination and gender discrimination under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL") against Defendants for discriminating against her, subjecting her to a hostile work environment, and wrongfully terminating her employment because of her pregnancy.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs. Plaintiff is a citizen of the State of New York. Defendant Southern Graphic Systems, LLC is a citizen of the State of Kentucky whose sole member is SGS International LLC, a citizen of the State of Delaware.  SGS International LLC's sole member is Peninsula Intermediate LLC, a citizen of the State of Delaware.  Peninsula Intermediate LLC's sole member is Peninsula Parent LLC, a citizen of the State of Delaware.  Peninsula Parent LLC has two members, Schawk Holdings Inc. and Logo Holdings IV Corp., both citizens of the State of Delaware.  Defendant Colgate-Palmolive Company is a citizen of the State of Delaware.

6.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within the Southern District of New York. Plaintiff was employed by Defendants and performed her work duties within this District, and the discriminatory conduct and wrongful termination occurred within this District.

7.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

8.     Plaintiff is an adult individual residing in Long Island City, New York. At all relevant times, Plaintiff was employed as a Design Execution Manager by Defendants.

9.     Defendant Southern Graphic Systems, LLC ("SGS") is a Kentucky Limited Liability Company with its principal place of business at 626 W. Main Street, Suite 400, Louisville, Kentucky 40202. SGS was Plaintiff's direct and joint employer with Colgate-Palmolive.

10.     Defendant Colgate-Palmolive Company ("Colgate-Palmolive") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1105 N Market Street, Wilmington, Delaware 19801.

11.     At all relevant times, both Defendants jointly employed Plaintiff and exercised control over the terms and conditions of her employment, including but not limited to hiring, supervision, work assignments, employment policies, and termination decisions.

12.     Upon information and belief, both Defendants are employers, and Plaintiff was an employee within the meaning of the NYSHRL and NYCHRL, and each employed more than four persons at all relevant times.

<u>STATEMENT OF FACTS</u>

13.     Plaintiff worked for Defendants as Design Execution Manager, from February 22, 2023 July 16, 2024, when they wrongfully terminated her employment.

14.     During her employment, Plaintiff worked as a Design Execution Manager managing Skin Care packaging for Colgate-Palmolive's EltaMD and PCA brands. Working directly under Colgate-Palmolive's supervision, Plaintiff stewarded complex packaging projects, consistently meeting deadlines and budgets while maintaining direct reporting relationships with Colgate-Palmolive management. Her responsibilities included conducting project status meetings, managing design execution for Colgate- Palmolive's skin care product lines, and coordinating with their stakeholders. Plaintiff consistently received exemplary performance reviews, with Colgate-Palmolive supervisors praising her as "an outstanding project manager" with "excellent performance under pressure" and noting her "meticulous attention to detail made her a key asset to our team."

15.    During her employment, Plaintiff worked as a Design Execution Manager managing Skin Care packaging for Colgate-Palmolive's EltaMD and PCA brands, working closely and reporting daily to her direct supervisors, Tracie Pulga, Colgate-Palmolive's Design Execution Manager, and Devesh Badola, Director of Packaging, when Pulga was on leave.

16.    As a Design Execution Manager for Colgate-Palmolive's brands, Plaintiff stewarded complex CPG packaging projects to successful conclusions, consistently meeting both timeline and budget requirements while reporting directly to Colgate-Palmolive supervisor, Tracie Pulga, for day-to-day work. Her role required coordinating directly with Colgate-Palmolive teams and stakeholders, conducting comprehensive project status meetings, and managing critical design execution decisions for their skin care product lines. Plaintiff created detailed documentation and transition plans for Colgate-Palmolive's projects, trained coverage personnel, and managed artwork for their brands, consistently receiving positive feedback from Colgate-Palmolive's supervisors and team members regarding her meticulous attention to detail and project management capabilities.

17.    During her employment, Plaintiff consistently received exemplary performance reviews from her Colgate-Palmolive colleagues, including a detailed recommendation from Robert Gajda, Design Integration Manager, who praised her as "an outstanding project manager" with "excellent performance under pressure, as well as from Louise Sullivan, Design Manager, who praised her as "the best AW manager," Sharmaine Cantero, Project Manager, who commended her work performance, and Carolyn Christy, Client Project Manager, who expressed strong support for her capabilities.

Colgate-Palmolive's Recruitment and Hiring of Plaintiff

18.    In or around December 2022, Tracie Pulga, Colgate-Palmolive's Design Execution Manager, reached out to Plaintiff via Facebook messenger and inquired whether Plaintiff was interested in a potential position at Colgate-Palmolive. Plaintiff responded that she was.

19.    On February 17, 2023, after initial interviews, Pulga informed Plaintiff that she would start working at Colgate-Palmolive on February 22, 2023.

20.    To start working for Colgate-Palmolive, Plaintiff left her job at the time.

21.    In or around February 2023, Pulga informed Plaintiff that despite that she was going to work for Colgate-Palmolive and their clients, Colgate-Palmolive was going to hire her through SGS "for legal reasons."

22.    When Plaintiff sought clarification, Pulga confirmed that "[Colgate-Palmolive] likes to hire through vendors due to [and to avoid] legal liability [for its employees]," demonstrating that Colgate-Palmolive was trying to avoid its and responsibilities under laws designed to protect employees like Plaintiff.

23.    In February 2023, Pulga introduced Plaintiff to SGS, who prepared a three-month work contract for her work at Colgate-Palmolive, with the help of Crystal Eiswert, SGS Account Manager.

24.    From February 22, 2023 to March 3, 2023, Plaintiff received 8-day work training from Pulga at her home in New York City, including training for BEAT routing matrix, print specifications, contact information and Colgate-Palmolive's other systems and processes.

25.    On March 6, 2023, Pulga went on a medical leave of absence for about 6 weeks.

26.    In or about June 2023, on a videoconference, Pulga informed Plaintiff that everyone loved Plaintiff's work and offered her a full-time position at Colgate-Palmolive after her initial three-month contract through SGS expired. Plaintiff accepted a job at Colgate-Palmolive.

<u>Colgate-Palmolive Unlawful Hiring Practices Aimed to Exploit it Employees as Contractors</u>

27.    Defendants Colgate-Palmolive and SGS have developed a symbiotic relationship where SGS gets paid to keep Colgate-Palmolive's employees on its books for a percentage of the Colgate-Palmolive's employees' compensation and Colgate-Palmolive attempts, unsuccessfully, to avoid its employer duties and obligations by misclassifying its workers as subcontractors from SGS, when in all respects these individuals work for Colgate-Palmolive directly and Colgate-Palmolive controls the terms and conditions of their employment.

28.    Colgate-Palmolive unlawfully forces many of its employees to be hired through third-party vendors, including SGS, in order to shrug off workers' protections, its' New York State and federal maternity benefits and obligations that applied to Plaintiff.

29.    Prior to Pulga's introduction of Plaintiff to SGS, Plaintiff has never heard and never worked with SGS.

30.    Plaintiff was offered her job at Colgate-Palmolive directly by Colgate-Palmolive.

31.    Colgate-Palmolive required that Plaintiff be hired through SGS, a vendor it introduced her to.

32.    Despite the fact Plaintiff was recruited by Colgate-Palmolive executive directly, worked exclusively with Colgate-Palmolive's leaderships, staff and clients and underwent full Colgate-Palmolive onboarding, on paper, she was paid through SGS.

33.    SGS collected a part of Plaintiff's compensation, keeping it for itself, for its service of keeping her on their books and shielding Colgate-Palmolive of its employers' duties.

34.    Colgate-Palmolive supervised Plaintiff's day-to-day work and gave her performance review and feedback.

35.    Plaintiff was supervised and managed directly by Pulga, a Colgate-Palmolive supervisor, or other Colgate-Palmolive's employees that replaced her during Pulga's medical leave. Plaintiff regularly or daily communicated, reported and collaborated with Pulga on her work assignments.

36.    No one at SGS supervised or managed Plaintiff or her work.

37.    Eiswert, SGS's Account Manager, did not supervise Plaintiff's day-to-day work, but only handled the administrative HR duties, such as Plaintiff's requests for days off, vacation and paystubs.

38.    All Plaintiff's work was with Colgate-Palmolive's staff and departments, including Legal Department, Packaging Department, Regulatory Department, Design Department and etc.

39.    Colgate-Palmolive set Plaintiff's terms and conditions of employment, including determining her work location, schedule and hours, her work duties, her projects and assignments.

40.    Colgate-Palmolive set the budget for Plaintiff's projects and set deadlines.

41.    Colgate-Palmolive set processes and procedures for work that Plaintiff performed.

42.    Plaintiff was subject to Colgate-Palmolive's workplace policies and Colgate's holiday schedule, just like their other employees.

43.    Plaintiff used Colgate-Palmolive's tools, equipment and software for her work, including Colgate's MacBook Pro, monitor, wireless mouse, chargers, headset, email address, servers, software and email accounts, spreadsheets and matrixes, BEAT (art management program) and etc.

44.     Colgate-Palmolive fired Plaintiff, a week before her delivery date of her first child, to avoid its employers' obligations to her as a new mother, including to avoid paying her full maternity benefits, keeping her position open and protected, and dealing with any child rearing accommodation thereafter. Instead, with SGS's full knowledge and collusion, Colgate-Palmolive told Plaintiff the position was eliminated and then replaced the exact same position the same week with a non-pregnant worker, who did not need maternity leave and accommodations for childrearing.

45.     There was no legitimate reason for Colgate-Palmolive to involve SGS in Plaintiff's employment besides bad faith self-interest to avoid its employer's duties and obligations to her and others like her.

46.     Colgate-Palmolive callously discriminated against Plaintiff because of her pregnancy because it knew that it "hir[ed her] through vendors" and supposed that it would be harder for Plaintiff to bring her claims, including for wrongful termination and discrimination, against Colgate-Palmolive, but it was wrong because its conduct makes it a joint employer under the law, despite its unlawful scheme with SGS.

47.     Upon information and belief, there are at least 10 other individuals who worked and work directly and only for Colgate-Palmolive, but with Colgate-Palmolive's instance they were hired through SGS, like Plaintiff.

48.     Upon information and belief, none of these workers had any prior relationship with SGS and were only processed through SGS in order to effectuate the unlawful scheme of avoiding employer's duties and obligations by Colgate-Palmolive described herein.

49.     By colluding with SGS and keeping its employees on SGS's books, Colgate-Palmolive attempted to circumvent NYCHRL, NYSHRL and its federal counterparts and tries to

avoid legal obligations to its misclassified employees. This scheme is an unlawful disregard for the law and benefits only Colgate-Palmolive and SGS, violating workers' rights and NYCHRL, NYSHRL and other laws' broad and remedial protections.

Plaintiff's Compensation

50.     During her initial contract period from February 22, 2023, to October 2, 2023, Plaintiff was paid at a rate of $69 per hour, without any benefits, through SGS as a production agency.

51.     On October 2, 2023, Plaintiff was converted to full-time employment with Colgate-Palmolive at an annual base salary of $118,000, with benefits including medical/dental coverage, HSA, 401K, five weeks of PTO, two personal days, and paid holidays.

52.     Plaintiff accepted the full-time position at Colgate-Palmolive with reassurances of Pulga that this was a long-term commitment to the company and Plaintiff working together. Plaintiff did not sign any contract for this full-time position.

53.     In or around August 2023, Plaintiff also started working on an additional skin brand, called PCA.

54.     Plaintiff consistently performed her job duties in an exemplary manner, as evidenced by multiple positive performance reviews and reference letters from colleagues, including Pulga, Robert Gajda, Design Integration Manager, and other Colgate-Palmolive colleagues, such as Kelly Blekesi, Sam Foehr, Julie Fakeh and Erica Brokaw.

Plaintiff's Journey Motherhood & Defendants' Discrimination

55.     On October 23, 2023, Plaintiff underwent an IVF procedure as part of her efforts to start a family. The procedure was successful, and she became pregnant.

56.     In April 2024, Plaintiff informed her supervisor, Pulga, that she was pregnant. Upon learning of her pregnancy, Pulga responded inappropriately and discriminatorily by stating, "what do you mean you are pregnant, you don't have a BF." Pulga did not congratulate Plaintiff on her pregnancy but rather seemed surprised that Plaintiff was having a child as a single mother.

57.     On April 18, 2024, Carolyn Christy, SGS Senior Client Project Manager, expressed concern about Plaintiff's pregnancy when she found out, stating that "WOW - I had no idea!!!!! Congrats! Oh no - no one can fill your shoes!"

58.     In April 2024, Plaintiff informed Eiswert, SGS Account Manager, that she was pregnant.

59.     Following the April 2024 announcement of Plaintiff's pregnancy, Defendants' treatment of Plaintiff changed markedly.

60.     From May to July 2024, Pulga fixated on the fact that Plaintiff is a single mother and questioned her on several occasions on how she plans to raise a child by herself at 44 years old. For instance, Pulga asked her "who will help you?," "How long will your mom stay? And what about after she leaves? What is your game plan? Who will watch the baby when you come to the office?"

61.     Pulga's invasive questions about Plaintiff, her pregnancy and childcare plans demonstrate her prejudice against pregnant women and concern that Plaintiff was going to be unable to work for Defendants with the same commitment and focus as she did before, leading Pulga to discriminate against Plaintiff because she was pregnant and about to become a caregiver.

62.     From May to July 2024, Pulga also seemed to insinuate that since motherhood alone will be hard for Plaintiff that somehow, she will be unable to do her job as well as before. For example, Pulga eagerly wanted to know who would watch the baby at all times and repeatedly

11

harassed Plaintiff on how she would do her job. Plaintiff told her that she was planning to take care of the baby herself and then hire help after the first six months when she comes into the office. Pulga seemed unsatisfied with her answer and continued to badger Plaintiff repeatedly on how she would "do her job after the baby arrives."

63.    Pulga's focus on Plaintiff as a single mother became more apparent when she repeatedly questioned Plaintiff about her maternity leave plans.

64.    Between May and July 2024, Plaintiff was repeatedly questioned about her maternity leave plans in a manner that made her uncomfortable.

65.    In May 2024, Pulga asked Plaintiff how she would handle the maternity leave and what is her "game plan," once again seemingly irritated with the fact that Plaintiff is pregnant. In response, Plaintiff told her that she plans to take maternity leave, consisting of at least 6-8 weeks of maternity leave, depending on means of delivery, and 5 weeks PTO. Pulga was short with Plaintiff and visibly displeased upon hearing this.

66.    In May 2024, Plaintiff also told Pulga that while she may be eligible for New York State Paid Maternity Leave at 67%, she would not be taking it because, as single mom, she will not be able to pay the bills and needs to return to work ASAP. Despite this reassurance, Plaintiff observed Pulga get tense at the idea of Plaintiff taking this maternity leave.

67.    In May 2024, Plaintiff also told Pulga that she may take FMLA leave later in the year if there is an emergency with the baby or any need. Once Pulga heard that Plaintiff knew about her rights of taking FMLA and knew she had an option to take it, she tensed up even more and started viewing Plaintiff as more of a problem due to her pregnancy and needing to take care of the baby, which potentially would require time off work.

68.    In June 2024, Pulga again approached Plaintiff and asked her about her maternity leave, once again making Plaintiff uncomfortable.

69.    In or around July 8, 2024, Plaintiff informed Defendants that she is scheduled to be induced on July 24, 2024.

70.    In July 2024's 1:1 meeting between Plaintiff and Pulga, Pulga growing more frustrated and nervous again pressed Plaintiff on her maternity leave plans. Plaintiff once again reiterated to Pulga her plan for maternity leave. Plaintiff also mentioned that she may be eligible for New York Paid Family Leave, but she intends to use it only in case of an emergency.

<u>Wrongful Termination</u>

71.    On July 16, 2024, at 3:30 p.m., Plaintiff met with Pulga, who told her to leave her laptop in the office when she goes on maternity leave. Plaintiff told Pulga that she plans to work up until her induction on July 24, 2024, so she needs her laptop, but Pulga told her to leave it and that Pulga would personally bring her the laptop to her house during maternity leave.

72.    On July 16, 2024, at around 4:00 p.m., with her due date approaching, Plaintiff was abruptly terminated during a video call with Eiswert and SGS's HR representative, Michelle Champagne, a decision clearly made by Pulga or another Colgate-Palmolive supervisors, as Eiswert never supervised Plaintiff, her day-to-day or have any involvement with her actual job duties or work.

73.    After terminating Plaintiff, Defendants callously demanded that she works until 5:00 p.m. on July 24, 2024, only three hours before her induction at 8:00 p.m. the same day. Plaintiff was shocked at the request and tone-deaf discriminatory entitlement to her time when Defendants had just left her penniless before she was about to become a mom for the first time.

74.    When Plaintiff later asked Eiswert "why didn't you let me go after I gave birth but instead right before, knowing I could have lost my child due to stress," Eiswert callously replied "trust me, we contemplated this, but thought it was best [for Colgate] to let you go before you gave birth."

75.    During the termination meeting, Defendants provided contradictory reasons for Plaintiff's termination, alternately claiming that her role was being allegedly "eliminated" due to her alleged "1-year contract" having expired and budget cuts. Both these reasons were untrue and pretext to Defendants' discrimination.

76.    Plaintiff found Defendants' reasons for termination extremely suspicious and hard to believe, because she did not sign any contract with Defendants, so "the 1-year contract" could not have expired. In fact on July 17, 2024, Plaintiff followed up with Champagne how she could be terminated due to her contract expiring, if she signed no contract, and Champagne could not explain or give her any reply.   Champagne had to concede that the alleged 1-year contract "it did not exist," effectively admitting to the made-up nature of the reason given for Plaintiff's termination.

77.    Additionally, Plaintiff knew that Marketing Department spent money over budget consistently and more money was allocated to it, even when the money lost was bigger than Plaintiff's yearly salary and even when it was lost on cancelled or experimental project, so her termination was unlikely due to budget cuts.

78.    No other Colgate-Palmolive or SGS employees, including the 50-60 with whom Plaintiff worked with, were eliminated or laid off at the time when Plaintiff was allegedly "eliminated."

79.     Plaintiff being the only person "laid off" whose position was allegedly being "eliminated," when the other 50-60 people who Plaintiff worked with and were not pregnant kept their jobs, points that Defendants targeted Plaintiff and chose to terminate her when she was pregnant and cuts against an argument that there was a budget issue affecting departments working with Plaintiff or on the same brands.

80.     Defendants' stated reasons for Plaintiff's termination, specifically that the position was "eliminated," is demonstrably false as seen by the fact that Plaintiff's Design Execution Manager position was immediately filled by Angie Clinefelter, a 46-year-old married woman, who was not pregnant, was given Plaintiff's same exact title "Design Execution Manager." See her LinkedIn profile:



81.     Defendants, one week before Plaintiff's delivery date, replaced her exact position with a new employee who was not pregnant, and likely beyond child bearing years, in the same week in July 2024.

82.     Defendants' claim of budgetary constraints is further undermined by their willingness to incur the costs of hiring and training a new employee, Angie Clinefelter, rather than retaining Plaintiff and accommodating her pregnancy-related needs.

Plaintiff's Emotional Distress

83.    Defendants terminating Plaintiff one week before her scheduled induction was particularly callous as they knew that as a single mother, she had no second income or insurance and needed the job and benefits.

84.    On July 17, 2024, Plaintiff suffered a panic attack and could not stop crying for multiple days leading up to her induction. Plaintiff felt such high levels of stress that she feared for the health of her baby.

85.    On July 24, 2024, Plaintiff had her induction scheduled for 8:00 p.m. However, the induction failed due to Plaintiff's elevated stress levels and doctors performed a stress test on her to check that the baby was alive and moving.

86.    On July 25, 2024, Plaintiff had multiple panic attacks and stopped feeling her baby moving inside her. She called her OBGYN and told her that she lost her job and is afraid of not being able to afford food for her child and is having repeated panic attacks and now she can't feel her daughter move. The OBGYN referred Plaintiff for another stress test to make sure the baby is alive.

87.    On July 27, 2024, just eleven days after her termination, Plaintiff underwent an emergency C-section after a failed two-day induction.

88.    Due to Defendants' discrimination of her, Plaintiff is facing eviction proceedings, lost a housing lottery opportunity, and has been forced to rely on public assistance programs including food stamps, HRA/Cash assistance, and WIC to support herself and her newborn child.

89.    Plaintiff has lost her milk and has been unable to breastfeed her newborn daughter due to the emotional distress caused by Defendants.

90.     From July 2024 to date, Plaintiff suffers debilitating emotional distress, regular panic attacks, insomnia, physical pain, crying spells and nightmares. She lives in a state of panic and in poverty due to Defendants' callousness.

91.     On October 28, 2024, Plaintiff has started seeing a psychiatrist, who subsequently diagnosed her with panic attacks, postpartum depression and emotional distress and prescribed her several medications, which Plaintiff takes to date.

92.     Plaintiff's termination caused her severe emotional distress and financial hardship, leading to multiple diagnosed conditions including a) Postpartum Depression (F53.0); b) Adjustment Disorder (F43.20); c) Acute Stress Disorder (F43.0); d) Panic Disorder; e) Carpal Tunnel Syndrome; and f) Adjustment Disorder with anxious mood.

93.     Plaintiff's medical conditions resulting from the discriminatory termination have required her to take multiple medications, including Fluoxetine 20mg and Klonopin 0.5mg, and attend both psychological counseling and twice-weekly physical therapy sessions for carpal tunnel syndrome.

94.     Defendants' discriminatory intent is further demonstrated by the timing of Plaintiff's termination, which coincided with her imminent maternity leave, the pattern of negative treatment following her pregnancy announcement, and the immediate replacement of her position with a non-pregnant employee.

95.     Prior to announcing her pregnancy, Plaintiff received consistently positive feedback from her supervisors and colleagues. Multiple written commendations and reference letters document her excellent performance, including specific praise for her work on EltaMD and PCA brand packaging projects.

96.    The abrupt change in Defendants' treatment of Plaintiff following her pregnancy announcement is evidenced by documented positive feedback from multiple colleagues, including Sharmaine, Robert, Louise, and Carolyn, which stands in stark contrast to the sudden decision to terminate her employment.

97.    Defendants' claim of role elimination due to budget cuts is demonstrably false, as evidenced by the immediate hiring of Angie Clinefelter to perform the same duties with the same title as Plaintiff.

98.    The severe financial impact of Defendants' discriminatory termination has forced Plaintiff to deplete her savings and rely on public assistance programs, despite her previous annual salary of $118,000 and comprehensive benefits package.

99.    Defendants' discriminatory actions have caused Plaintiff significant emotional distress, physical health complications, and financial hardship, requiring ongoing medical treatment, psychological counseling, and public assistance support.

100.    The timing, circumstances, and contradictory explanations surrounding Plaintiff's termination, combined with the immediate hiring of a non-pregnant replacement, demonstrate a clear pattern of pregnancy discrimination in violation of the NYSHRL and NYCHRL.

101.    The discriminatory impact of Defendants' actions extends beyond immediate financial losses, as Plaintiff's termination occurred at a critical time when she most needed stability and support, mere weeks before giving birth to her child.

102.    Defendants' conduct demonstrates a calculated effort to avoid their legal obligations regarding maternity leave and accommodation, as evidenced by their timing of the termination just before Plaintiff would have become eligible for maternity leave benefits.

103.    The stress and anxiety caused by Defendants' discriminatory actions directly impacted Plaintiff's pregnancy and postpartum experience, preventing her from breastfeeding and requiring the assistance of a lactation consultant, further causing her stress and additional expenses on an already depleted budget.

104.    Defendants' discriminatory termination has also had lasting consequences on Plaintiff's physical and mental health, requiring ongoing medical treatment and causing significant disruption to what should have been a joyful time welcoming her newborn.

105.    The discriminatory nature of Defendants' conduct is further evidenced by their failure to engage in any interactive process regarding Plaintiff's upcoming maternity leave, instead opting for immediate termination without exploring reasonable accommodations or leave arrangements.

106.    The timing and manner of Plaintiff's termination, mere weeks before her due date, demonstrates a calculated effort by Defendants to avoid their legal obligations regarding pregnancy accommodation and maternity leave benefits.

107.    The discriminatory impact of Defendants' actions is particularly evident in their disparate treatment of Plaintiff compared to non-pregnant employees, as demonstrated by their willingness to provide extended leaves of absence to other employees for various reasons, including Pulga, while denying Plaintiff her legally protected right to maternity leave.

108.    Defendants' conduct has caused Plaintiff to experience significant emotional distress during what should have been a joyful time in her life, forcing her to manage the physical demands of late-stage pregnancy and emergency C-section while simultaneously coping with unemployment and financial insecurity.

109.    The severity of Defendants' discriminatory conduct is reflected in Plaintiff's need for increased mental health support and medication, including doubling her anxiety medication dosage to cope with the stress and emotional trauma of her termination.

110.    Defendants' actions have not only impacted Plaintiff's immediate financial and emotional well-being but have also created lasting consequences for her career trajectory and professional development opportunities.

111.    The pretextual nature of Defendants' termination decision is further evidenced by their failure to document any performance issues or concerns prior to Plaintiff's pregnancy announcement, followed by their sudden claim of budgetary constraints coinciding with her approaching maternity leave.

112.    Defendants' discriminatory conduct has forced Plaintiff to make impossible choices between her health, her newborn's well-being, and her financial stability, as demonstrated by her inability to take adequate time for physical recovery following her emergency C-section due to financial pressures.

113.    The contrast between Plaintiff's treatment and that of her replacement, Angie Clinefelter, demonstrates Defendants' discriminatory animus, as they were willing to invest resources in hiring and training a new employee rather than supporting their existing, pregnant employee.

114.    Defendants had no legitimate reasons to fire Plaintiff besides the fact that she was pregnant.

<u>FIRST CAUSE OF ACTION</u>
PREGNANCY DISCRIMINATION
UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

115.    Plaintiff repeats and realleges every preceding allegation as if set forth fully herein.

116.    At all relevant times, Plaintiff was an "employee" and "person" within the meaning of the NYSHRL and Defendants are "employers."

117.    The NYSHRL prohibits employment discrimination based on sex. N.Y. Exec. Law § 296(1)(a). Pregnancy discrimination is a form of sex discrimination.

118.    Defendants discriminated against Plaintiff by subjecting her to disparate treatment, creating a hostile work environment, and ultimately wrongfully terminating her employment because she was pregnant.

119.    Following Plaintiff's announcement of her pregnancy in April 2024, Defendants engaged in a pattern of discriminatory conduct, including but not limited to a) Making discriminatory comments about her pregnancy status; b) Repeatedly questioning her about maternity leave plans in a hostile manner; c) Subjecting her to increased scrutiny and harassment; d) Terminating her employment weeks before her due date.

120.    Defendant Southern Graphic Systems, LLC is vicariously liable for the actionable discriminatory environment created by its supervisors who had immediate authority over Plaintiff.

121.    Defendant Colgate-Palmolive Company is vicariously liable for the actionable discriminatory environment created by its supervisors who had immediate authority over Plaintiff.

122.    As a direct result of Defendants' discrimination, Plaintiff has suffered and continues to suffer economic, emotional and physical damage, for which Defendants are liable.

SECOND CAUSE OF ACTION
PREGNANCY DISCRIMINATION
UNDER THE NEW YORK CITY HUMAN RIGHTS LAW

123.    Plaintiff repeats and realleges every preceding allegation as if set forth fully herein.

124.    At all relevant times, Plaintiff was an "employee" and "person" within the meaning of the NYCHRL and Defendants were "employers."

125.    Plaintiff was treated less well than her non-pregnant colleagues because she was pregnant, violating N.Y.C. Admin. Code § 8-107(1)(a).

126.    Defendants discriminated against Plaintiff by terminating her employment weeks before her due date, which they did not do to non-pregnant employees.

127.    The discriminatory nature of Defendants' conduct is evidenced by a) The timing of termination coinciding with imminent maternity leave; b) Contradictory explanations for termination; c) Immediate replacement with non-pregnant employee; d) Pattern of negative treatment following pregnancy announcement; e) Documented positive performance reviews prior to pregnancy announcement.

128.    Defendant Southern Graphic Systems, LLC is strictly liable for the actionable discriminatory environment created by its supervisors who had immediate authority over Plaintiff.

129.    Defendant Colgate-Palmolive Company is strictly liable for the actionable discriminatory environment created by its supervisors who had immediate authority over Plaintiff.

130.    As a result of Defendants' discrimination, Plaintiff has suffered severe economic and non-economic damages, including economic, emotional and physical damages for which Defendants are liable.

131.    Defendants discriminated against Plaintiff with malice and/or reckless indifference to her rights under the NYCHRL.

THIRD CAUSE OF ACTION
HOSTILE WORK ENVIRONMENT
UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

132.    Plaintiff repeats and realleges every preceding allegation as if set forth fully herein.

133.    Following Plaintiff's pregnancy announcement, Defendants created and maintained a hostile work environment based on her pregnancy status.

134.    The hostile work environment included but was not limited to a) Discriminatory comments about her pregnancy status; b) Repeated hostile questioning about maternity leave plans; c) Increased scrutiny of her work; d) Isolation and exclusion from workplace activities; e) Creation of pretextual reasons for termination.

135.    The hostile work environment was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.

136.    Defendants knew or should have known of the hostile work environment but failed to take appropriate corrective action.

137.    As a direct result of the hostile work environment, Plaintiff has suffered severe emotional distress requiring medical treatment and medication.

FOURTH CAUSE OF ACTION
HOSTILE WORK ENVIRONMENT
UNDER THE NEW YORK CITY HUMAN RIGHTS LAW

138.    Plaintiff repeats and realleges every preceding allegation as if set forth fully herein.

139.    Plaintiff was treated less well than other employees because of her pregnancy status, violating N.Y.C. Admin. Code § 8-107(1)(a).

140.    The discriminatory acts and harassment that Plaintiff endured constitute a hostile work environment under NYCHRL.

141.    As a result of Defendants subjecting her to the hostile work environment, Plaintiff has suffered and continues to suffer a) Severe emotional distress; b) Mental anguish; c) Physical pain and suffering; d) Medical expenses; and e) Loss of enjoyment of life

142.    Defendants subjected Plaintiff to a hostile work environment with malice and/or reckless indifference to her rights under the NYCHRL.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

      a.     Accept jurisdiction over this matter;

      b.     Impanel and charge a jury with respect to the causes of action herein;

      c.     Enter a declaratory judgment that the practices complained of herein are unlawful under the New York State Human Rights Law and New York City Human Rights Law.

      d.     Enter an injunction ordering Defendants to cease and desist from engaging in unlawful practices, policies, customs, and usages set forth herein;

      e.     Award Plaintiff back pay, front pay, and all benefits, including but not limited to salary increases, bonuses, and equity compensation she would have received but for Defendants' discriminatory and retaliatory practices;

      f.     Award Plaintiff compensatory damages for mental anguish, emotional distress, and humiliation in an amount to be determined at trial;

      g.     Award Plaintiff punitive damages in an amount to be determined at trial;

      h.     Order Defendants to implement and maintain policies, practices, and programs which provide equal employment opportunities and prevent discrimination and retaliation;

      i.     Award Plaintiff pre-judgment and post-judgment interest;

      j.     Award Plaintiff the costs of this action, including reasonable attorneys' fees and expert fees; and

      k.     Grant such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact

the Complaint raises.

Dated: New York, New York
        August 14, 2025

                                    LIPSKY LOWE LLP


                                    s/ Christopher H. Lowe
                                    Christopher H. Lowe
                                    Milana Dostanitch
                                    420 Lexington Avenue, Suite 1830
                                    New York, New York 10170
                                    212.392.4772
                                    chris@lipskylowe.com
                                    milana@lipskylowe.com
                                    *Attorneys for Plaintiff*